**HEATHER S., a minor, by KATHY S., her natural parent and next friend, Plaintiff,**

v.

**STATE OF WISCONSIN, John T. Benson, individually and in his capacity as the Superintendent of the Wisconsin Department of Public Instruction, Juanita Pawlisch, individually and in her capacity as the Assistant Superintendent, Division for Handicapped Children and Pupil Services, Wisconsin Department of Public Instruction, Pewaukee School District, Lee Wille, individually and in his official capacity as the School District Administrator of the Pewaukee School District and Mary Cimbalnik (f/k/a Mary Roberts), individually and in her capacity as the Director of Special Education for the Pewaukee School District, Defendants.**

No. 95–C–778.

United States District Court, E.D. Wisconsin.

Aug. 21, 1996.

Ronald S. Stadler, Stadler & Schott, Brookfield, WI, for plaintiff.

James E. Doyle, Jr. and Mary Woolsey Schlaefer, Office of the Attorney General, Madison, WI, for State of Wisconsin, John T. Benson, and Juanita Pawlisch.

William Sosnay, Davis & Kuelthau, Milwaukee, WI, for Pewaukee School District, Lee Wille, and Mary Cimbalnik.

## OPINION AND ORDER

CURRAN, District Judge.

This is an action for review of the decision of a Special Education Review Officer under the Individuals With Disabilities Education Act, 20 U.S.C. § 1400 et seq. (IDEA). Essentially, the Review Officer upheld the finding of the Hearing Officer that Heather S., a 15–year old girl, born September 24, 1980, was not denied her right to a Free Appropriate Public Education (FAPE) and was not discriminated against due to her disability.

The court has jurisdiction under 20 U.S.C. § 1415(e)(2). The parties have filed cross motions for summary judgment. The standard of review of administrative agency decisions under the IDEA is provided by 20 U.S.C. § 1415(e)(2):

> In any action brought under this paragraph the court shall receive the records of the administrative proceedings, shall hear additional evidence at the request of a party, and, basing its decision on the preponderance of the evidence shall grant such relief as the court determines is appropriate.

Neither party has requested that the court hear additional evidence or argument. The court has already conducted two hearings at which significant argument was put forth. The court therefore, based on the administrative record, must independently determine whether the Pewaukee School District has satisfied the requirements of the IDEA with respect to Heather. In developing a modified *de novo* standard, Congress specifically rejected language which would have made

state administrative findings conclusive if supported by substantial evidence. *Hendrick Hudson District Board of Education v. Rowley,* 458 U.S. 176, 205, 102 S.Ct. 3034, 3050, 73 L.Ed.2d 690 (1982). The Supreme Court in *Rowley* held that because Congress requires the reviewing court to "receive the record of the [state] administrative proceedings" it impliedly required that due weight shall be given to these proceedings. Furthermore, the provision requiring the reviewing court to base its decision on the preponderance of the evidence does not invite the court to substitute its own notion of sound educational policy for those of the school authorities which they review. *Id.* at 206, 102 S.Ct. at 3050–51. Finally, the court in *Rowley* set forth the methodology for resolution of suits brought under section 1415(e)(2) as follows:

> First, has the state complied with the procedures set forth in the act? And second, is the individualized educational program developed through the acts, procedures reasonably calculated to enable the child to receive educational benefits? If these requirements are met, the state has complied with the obligations imposed by Congress and the courts can require no more.

*Id.* at 206–07, 102 S.Ct. at 3050–51. The party challenging the decision bears the burden of proof. *Board of Education of Murphysboro v. Illinois State Board of Education,* 41 F.3d 1162, 1167 (7th Cir.1994); *Board of Education of School District No. 21 v. Illinois State Board of Education,* 938 F.2d 712, 716 (7th Cir.1991).

## BACKGROUND

The following facts are not in dispute. Heather S. was first identified by the Pewaukee School District as being a child with exceptional educational needs when she was five years old. A multi-disciplinary team (M Team) was convened on April 25, 1986, after which she was enrolled in the Special Education Services in the Learning Disabilities (Early Childhood) Program for the 1986–87 school year in the Pewaukee Public Schools. Between the initial M Team and the filing of this lawsuit, 11 M Teams were convened and 16 individual educational programs (IEP's)

were prepared. For example, an IEP was developed for Heather in 1987, when it was determined that she had a learning disability. In 1988, it was determined that she could benefit from speech and language services and during third grade, the district determined that Heather should receive occupational therapy services. During the 1991–92 school year, Heather began receiving services for visual impairment. The district was required by law to conduct a re-evaluation every three years or whenever the Board has reason to believe that the child has a handicapping condition that has not been identified or whenever the child's parent or teacher requests a re-evaluation. *See* Wisconsin Administrative Code Pl 11.04(6).

In 1989, as the result of an independent evaluation at the Medical College of Wisconsin, Department of Neurology, Heather was diagnosed as having an Attention Deficit Hyperactivity Disorder (ADHD), given Ritalin, and in early 1990, she began experiencing seizures. At the end of the 1989–90 school year, Heather was evaluated as part of her three-year re-evaluation. The M–Team found that her primary handicapping condition remained learning disabled with continued speech and language and occupational therapy services to be provided. A neuropsychological evaluation, performed at the request of the parents, by Doctors Donna Recht and Mariellen Fischer, at the Medical College of Wisconsin, indicated that Heather was functioning with a verbal IQ in the low-average range with a performance IQ in the border-line range and with a full scale score in the low-average to border-line range.

Heather continued in the LD Program but in the 1992–93 school year, while she was in 6th grade at the Pewaukee Middle School, she began experiencing an increase in seizure activity, both in frequency and intensity, and began experiencing difficulty with academics and peer relationships. An M–Team was convened on May 17, 1993, at which a majority of the members agreed that Heather no longer met the criteria for learning disabled. Mary Roberts, the Director of Student Services for the Pewaukee Public Schools, did not approve the M Team report and the case

was returned to the committee for the consideration of various issues, including whether Heather met the criteria for other health impaired (OHI). Mary Roberts wrote to Heather's parents memorializing conversations which they had held to the effect that Heather was not to be tested for cognitive disabilities (CD) which "could possibly lead to an M–Team conclusion that Heather had a handicapping condition and/or an exceptional education need in that area." She stressed, however, her belief that the primary category of handicapping for Heather was secondary to providing appropriate programming for the child.

The M–Team met again on June 2, 1993, at which the team found Heather's primary handicapping condition to be other health impaired. An IEP meeting was held on June 8, 1993. Heather's parents signed the IEP but indicated that they disagreed that Heather's services would only be provided in a CD setting. They wished her to remain in the LD Program. On June 10, 1993, a placement offer was sent to Heather's parents stating that the program to be provided would be in the Cognitive Disability–Borderline (self-contained integrated) program at the Richmond School. The placement justification provided as follows:

> Heather's continuing medical complications adversely affect her ability to process, organize, and recall previous and current learned information that prevents academic growth. Heather is in need of a more individualized and specialized educational program that will take into account her handicapping conditions and attempt to work successfully at increasing her knowledge base and social/adaptive behaviors. Her needs can be most appropriately addressed in a cognitive disability-borderline program designed to focus on her current academic and social/adaptive levels.

Prior to the May 17, 1993, M–Team, Heather was evaluated by members of the Team, including Dennis Cahn, the school psychologist. He administered the WISC III, an intelligence test. On that test Heather scored 61 on performance, 73 on verbal and a full scale IQ of 65. Mr. Cahn, however, questioned the validity of the test results, believing that Heather's stronger verbal performance indicated higher functioning and that the score was further adversely affected by Heather's seizure activity, her attention deficit hyperactivity disorder, and her nonverbal learning disability. Other M–Team members who evaluated Heather included an LD teacher, a teacher for the visually impaired, a speech and language clinician, an occupational therapist, and Heather's regular classroom teacher.

On August 16, 1993, Heather's parents notified the district that they desired to appeal the June 8, 1993, IEP and the June 10, 1993, placement at the Richmond School. Another IEP meeting was held on August 27, 1993, which provided for the "stay put" provision of Heather's program until there was a resolution of the issues being appealed, i.e. that she remain in the self-contained integrated LD Program and regular education combination. During this period of time Heather's parents were having her independently evaluated and on September 3, 1993, the parents notified the district that they would hold the hearing process in abeyance until such time as the independent evaluation results could be included for consideration in the development of amended IEP goals and objectives and reconsideration of the Richmond School placement offer.

Another M–Team evaluation was held on September 27, 1993, for the purpose of considering the independent evaluations and reviewing the IEP developed June 3rd and placement offer of June 10, 1993. The M–Team considered the evaluations performed at the St. Francis Children's Center, which included a test of auditory-perceptual skills and the Woodcock–Johnson tests of cognitive ability, a psychological test performed by Terrence McGuire, a school psychologist with the Pewaukee Public Schools, and an occupational therapy evaluation. A majority of the M–Team reaffirmed its original conclusion and recommendations. The IEP developed on September 29, 1993, was based on the M–Team conclusion that Heather's primary handicapping condition was OHI, as a result of which, the parents did not sign the IEP.

On October 1, 1993, Heather's parents, by counsel, notified the district that they were no longer willing to hold the due process hearing in abeyance. On October 12, 1993, the district sent a notice of placement to the parents again proposing that Heather be placed in the Richmond School with the following type of program to be provided: Cognitive Disability–Borderline (self-contained integrated); Speech and Language (resource/monitor); Visually Impaired (itinerant); Occupational Therapy (itinerant/consult); Specially Designed Physical Education (resource). The parties agreed that the due process hearing would be conducted before Doctor Eugene Braaksma. The hearing began on December 20, 1993 and concluded on February 23, 1994 and encompassed 11 days of testimony. The record consists of 2,647 pages of testimony, 127 exhibits and briefs totaling 160 pages. Final post-hearing briefs were submitted on May 13, 1994.

In May 1994, Heather's mother enrolled Heather at Kradwell School in Wauwatosa at her own expense. In August 1994, counsel for Heather's parents contacted counsel for the Pewaukee School District and requested that the district provide Heather with transportation to Kradwell School and the opportunity for Heather to participate in some of the district's programs. On October 11, 1994, this request was denied. The district has received no state or federal aid to educate Heather since she left the district schools in May 1994.

On November 15, 1994, Hearing Officer Braaksma issued his decision ordering as follows:

1. The Petitioners' claim that the District misidentified Heather's disability when the District identified her primary handicapping condition as Cognitively Disabled is UPHELD.

2. The Petitioners' claim that Heather's right to a Free Appropriate Public Education has been violated under the law due to various procedural errors is hereby DENIED.

3. The Respondent's determination at the June 3, 1993 M–Team meeting that

Heather's primary handicapping condition is Other Health Impaired is UPHELD.

4. The Petitioners' claim that Heather was discriminated against due to her disability and denied the benefits allowed to disabled persons as outlined under Section 504 of the Rehabilitation Act of 1973 is DENIED.

5. The parties are ordered to convene an IEP meeting in order to establish Heather's educational program based on:

a. her primary handicapping condition being Other Health Impaired (OHI), with additional handicapping conditions being Visual Impairment and Speech and Language.

b. her placement for the 1994–95 academic year being the self-contained integrated Learning Disabilities program at the Pewaukee Middle School.

6. The Respondent is ordered to submit the IEP to the hearing officer for review within fifteen (15) days from the date of this decision and order. The hearing officer will exercise final review authority to ensure that there is total and complete compliance of Heather's 1994–95 IEP with what has been outlined in this decision.

On October 13, 1994, Kathy S. filed a due process hearing request alleging that by failing to provide transportation to Heather and by refusing to provide Heather with an equitable opportunity to participate in the district's Special Education Program the district was failing to provide her with a free appropriate public education. The district refused to select a hearing officer to hear this request and the Department of Public Instruction determined that the issues raised in the request for a due process hearing were the same as those contained and decided in the Braaksma decision. Kathy S. filed an appeal of the Braaksma decision and Reviewing Officer Henry J. Plum was appointed to handle the appeal. The parties agreed to an extension of the statutory time limits.

On October 31, 1995, Review Officer Plum issued his decision, ordering as follows:

1. Hearing Officer Braaksma did not err when he determined that Heather S.'s

(the Child's) primary handicapping condition was Other Health Impaired.

2. Hearing Officer Braaksma erred when he found that the district mislabeled the Child's disability as cognitively disabled.

3. Hearing Officer Braaksma did not err when he determined that the Child's right to a Free and Appropriate Public Education had not been violated under the Law.

4. Hearing Officer Braaksma did not err when he determined that the Child had not been discriminated against due to her disability and had not been denied the benefits allowed to disabled persons as outlined under section 504 of the rehabilitation act of 1973.

5. Hearing Officer Braaksma did not exceed his authority in retaining jurisdiction ordering an IEP and placement after he issued his final order.

6. Hearing Officer Braaksma did err when he ordered that the Child should be placed in a self-contained integrated learning disabilities program at the Pewaukee Middle School. Therefore the Child is ordered to be placed in a CD Borderline Program at the Richmond School or other appropriate school as determined by the District containing all of the same components of the CD–Borderline program at the Richmond School.

7. Additional testimony is not necessary to supplement the record.

8. The Parents have not prevailed in this action.

9. The District is ordered to convene an IEP meeting for the 1995–96 school year within the next thirty (30) days consistent with the findings of this order. In addition the School Staff at the Kradwell school should be given the opportunity to attend and provide input to the development of such IEP.

### SUMMARY JUDGMENT

Typically, when the court is presented with a motion or cross motions for summary judg-ment, the determining factor is whether "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Federal Rule of Civil Procedure 56(c). Substantive law identifies which facts are material, *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Only disputes over facts which are outcome determinative under the applicable substantive law will preclude the entry of summary judgment. *Id.* Where the record taken as a whole could not lead a rational trier of fact to find in favor of the nonmoving party, there is no genuine issue for trial. *Id.* The movant bears the initial burden of demonstrating the absence of a genuine issue of material fact, *Roger v. Yellow Freight Systems, Inc.,* 21 F.3d 146, 148 (7th Cir.1994). If this showing is made, the nonmovant must go beyond the pleadings and set forth specific facts which show that there is a genuine issue for trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). In resolving the motion, the court must view the record and reasonable inferences drawn therefrom in the light most favorable to the nonmoving party. *Griffin v. City of Milwaukee,* 74 F.3d 824, 826–27 (7th Cir.1996).

In *Hunger v. Leininger,* 15 F.3d 664 (7th Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 123, 130 L.Ed.2d 67 (1994), the Seventh Circuit differentiated the typical summary judgment procedure from a judicial review of an administrative action. Typically, in this case, the review is conducted on the basis of the record compiled in the administrative procedure and it is the function of the court to decide whether the evidence in the administrative record supports the agency's finding. *Id.* at 669 citing *Camp v. Pitts,* 411 U.S. 138, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1983) (per curiam) *Beerly v. Department of the Treasury,* 768 F.2d 942, 945 (7th Cir.1985). In moving for summary judgment, the party challenging the decision in an administrative proceeding does not implicitly reserve the right to trial if the motion is denied since there is no right to trial in a review proceed-

ing. "The motion for summary judgment is simply the procedural vehicle for asking the judge to decide the case on the basis of the administrative record." *Id.* citing *Sabine River Authority v. U.S. Department of Interior,* 951 F.2d 669, 678–79 (5th Cir.1992). The court then distinguished a request for judicial review of a case brought under the IDEA. In these cases the court "shall receive the record of the administrative proceedings, *shall hear additional evidence at the request of a party,* and, basing its decision on the preponderance of the evidence shall grant such relief as the court determines is appropriate." *Id.* citing 20 U.S.C. § 1415(e)(2) (emphasis supplied by the court). However, when a party requesting summary judgment wishes to reserve the right to present additional evidence, the party must make clear its desire to do so. In the absence of this clear request, the court "is entitled to assume that the parties want the case decided on the basis of the administrative record." In moving for summary judgment without indicating a desire to present additional evidence, the court is asked to determine, on the basis of the record, "whether the Administrative Hearing Officers below failed to apply the proper law and failed to make findings and orders consistent with the greater weight of the evidence thus invalidating the defendant school district's educational plan and requiring a ruling in favor of the parent's requested program." *Id.* The party requesting summary judgment in an IDEA case thus cannot move for summary judgment without a request to hear additional evidence and, if unsuccessful, "ask for an opportunity for a second, an evidentiary, bite at the judicial apple." *Id.* at 670. The court will thus proceed to determine whether the preponderance of the evidence supports the M–Team's findings and IEP developed for Heather.

## DECISION

■ This case was vigorously and passionately fought before Hearing Officer Braaksma. He heard substantial evidence that supported his decision in favor of the district. He also heard substantial evidence in support of the parents' position. The hearing was a battle of experts wrangling over Heather's primary disabling condition and what type of placement would afford her the best educational opportunities. It is the court's function to take an independent and critical look at the evidence and the reasoning of the Hearing Officer while giving deference to his expertise.

The IDEA requires that the school district provide Heather with a free appropriate public education. However, a free appropriate public education is not necessarily the best possible education nor is it one that maximizes the potential of each child with disabilities or, in the case of Heather, with a variety of complex disabilities. *Hendrick Hudson District Board of Education v. Rowley,* 458 U.S. 176, 191–203, 102 S.Ct. 3034, 3043–49, 73 L.Ed.2d 690. A free appropriate public education is one that provides personalized instruction with sufficient support services to permit the child to benefit educationally from that instruction. *Id.* at 203, 102 S.Ct. at 3049. The main bone of contention was whether Heather's primary handicapping condition was learning disabled. Wisconsin Administrative Code Section Pl 11.35 provides the eligibility criteria for the various handicapping conditions. It provides that "the handicapping condition of learning disabilities denotes severe and unique learning problems due to a disorder existing within the child which significantly interferes with the ability to acquire, organize or express information. These problems are manifested in school functioning and an impaired ability to read, write, spell, or arithmetically reason or calculate." PI 11.35(f). In order to meet the criteria, a child whose primary handicapping condition is due to learning disabilities must exhibit a significant discrepancy between functional achievement and expected achievement. Furthermore, children whose primary handicapping condition is due to learning disabilities shall exhibit normal or potential for normal intellectual functioning. Pl 11.35(2)(f) & (2m) & (2x). In determining whether the child exhibits normal or potential for normal intellectual functioning, the measure "may be established by a score above a minus one standard deviation on a

single score intelligence instrument, or by a verbal or performance quotient of 90 or above on a multiple score intelligence instrument." Pl 11.35(f)(2x)(a).

Lynn Goeden–Hough works with visually impaired students as part of the Waukesha County Exceptional Education Cooperative. She had worked with Heather for four years, three of which she was her vision specialist. She noted that in sixth grade she started seeing "some very major regressions in Heather's abilities." Transcript page 1042. Heather "was becoming very belligerent, very stressed with homework. The seizures were increasing greatly. She was not able to follow through with the simplest of directions in class: Heather, take out your book, or, Heather, turn to such and such a page." *Id.* Goeden–Hough was familiar with the students in the Richmond School, believed that Heather would greatly benefit from the Richmond placement. "She would be in a setting where she is ... working with peers that are at her appropriate age level and functioning level.... From the vision standpoint they have their network computer system. They have smaller groups. There is integration with regular ed classes." Transcript at page 1060. She noted the concerns of some of the M–Team members that Heather had shut down, perhaps due to the increase of seizures, and her inability to retain information. "We were seeing belligerent acts by Heather, refusal to do things, tremendous frustration. She was upset. She was a very, very unhappy child which—in having seen Heather since fourth grade, this is very atypical for her." Transcript at page 1063.

Another of Heather's teachers, an M–Team member, Gayle Best, testified that Heather was struggling in all her academics. That at the time of the hearing she was in a science group that was at the 2.5 grade level and that she was not retaining any of the information that she had learned in her math program. She was working in the third grade level in spelling.

■ The criteria for Other Health Impaired is set forth at Pl 11.35(2)(k) as follows:

Other health impairment means having limited strength, vitality or alertness, due to chronic or acute health problems. The term includes but is not limited to a heart condition, tuberculosis, rhuematic fever, nephritis, asthma, sickle cell anemia, hemophilia, epilepsy, lead poisoning, leukemia, diabetes, or acquired injuries to the brain caused by internal occurrences of degenerative conditions, which adversely affects a child's educational performance.

Both independently and in deference to the hearing officer's conclusion, the court has determined that the preponderance of the evidence supports the district's determination that Heather was Other Health Impaired. Even more important, the court determines that the IEP and the placement at the Richmond School satisfies the IDEA's requirement that Heather be provided with a free appropriate public education. The conclusion of Hearing Officer Braaksma that Heather should remain in the CD program is not supported by the record. The court has reviewed the testimony of the parents' experts and is unable to conclude that Heather would not have benefited educationally from placement in the CD–Borderline Program at the Richmond School. The court further must reject the conclusion of Hearing Officer Braaksma that the district erred in labeling Heather as cognitively disabled. There is nothing in his opinion nor does there appear to be anything in the record which would support such a conclusion. At the mother's request, Heather was not tested for CD and, despite the fact that the placement offer was in a CD–Borderline setting, she was not so labeled. Doug Faile, the Director of Special Education in Pupil Services for the Hartland/Lakeside School District testified that a student classified as Other Health Impaired could legitimately be placed in a learning disability class, a cognitively disabled class, or an emotionally disturbed program. Transcript at page 2542.

The Court has concluded by a preponderance of the evidence that Heather was not denied a free appropriate public education nor were her civil rights denied. Neither the district defendants nor the state defendants discriminated against Heather because of her

disabilities nor did any of the minor procedural violations result in the plaintiff being denied a free appropriate public education. Many of the procedural violations of which the plaintiff now complains were actually waived during the long and torturous course of these proceedings. Although this opinion does not reflect the battery of testing to which this child was subjected, the record is replete with instances of test after test being administered to Heather. In this Court's opinion, the record itself is a testament to the mettle of Heather in being able to survive the unrelenting scrutiny to which she has been subjected. The tragedy is that the parties' vigor in pursuing the proper educational course for Heather was clearly motivated by the sincere concern for her best interests. I suspect that the parents, the educators, the psychologists, and all the other experts acted at times like the blind man and the elephant. Hopefully this will put an end to this controversy. Accordingly,

IT IS ORDERED that the plaintiff's motion for summary judgment is DENIED.

IT IS FURTHER ORDERED that the defendants' motions for summary judgment are GRANTED. The Clerk of Court is directed to enter Final Judgment in favor of the defendants and against the plaintiff who takes nothing.