**JVC KENWOOD CORPORATION,**
Plaintiff,

v.

**ARCSOFT, INC.; Nero,
Inc., Defendants.**

Case No. 2:12–CV–3662 MRP (JCx).

United States District Court,
C.D. California,
Western Division.

July 17, 2013.

Evan Finkel, James Chang, Pillsbury Winthrop Shaw Pittman LLP, Los Angeles, CA, Callie A. Bjurstrom, Pillsbury Winthrop Shaw Pittman LLP, San Diego,

CA, Kevin L. Daffer, Daffer McDaniel LLP, Austin, TX, for Plaintiff.

Adrian M. Pruetz, Andrew Y. Choung, Charles Christian Koole, Glaser Weil Fink Jacobs Howard Avchen and Shapiro LLP, Los Angeles, CA, for Defendants.

**Order Granting Defendant Nero's Motion for Partial Summary Judgment of Noninfringement and Granting Defendant Nero's Motions to Strike the Declarations of Tetsuro Fuse, James Chang, and Faramarz Azadegan**

MARIANA R. PFAELZER, District Judge.

## I. Introduction

Defendant Nero, Inc. ("Nero") seeks partial summary judgment of noninfringement due to patent exhaustion and express release with respect to a subset of the patents-in-suit asserted by Plaintiff JVC Kenwood Corporation ("JVC") in this patent infringement case. The patents-in-suit relate to recording and playback of optical discs conforming to standards specified as essential by either the DVD6C or the One–Blue licensing consortiums. In its motion, Nero argues that JVC has failed to provide evidence of an unlicensed direct infringer and therefore cannot show indirect infringement. JVC opposes the motion. The Court heard oral argument on April 23, 2013.

Having read and considered all of the briefs and arguments of the parties, the Court concludes that under the doctrines of patent exhaustion and express release, Nero's software products do not infringe U.S. Patent Nos. 5,535,008 ("the '008 Patent"); 6,141,491 ("the '491 Patent"); 6,212,329 ("the '329 Patent"); 6,490,404 ("the '404 Patent"); 6,522,692 ("the '692 Patent"); 6,768,711 ("the '711 Patent"); 6,788,881 ("the '881 Patent"); 7,023,790 ("the '790 Patent"); and 7,102,970 ("the '970 Patent") (collectively, "the Patents"). The Court **GRANTS** Nero's Motion for Partial Summary Judgment of Noninfringement.

## II. Background

The Court takes the following allegations as true and draws all reasonable inferences in the plaintiff's favor.

Plaintiff JVC is a Japanese corporation and owns each of the Patents by assignment. First Amended Complaint (Docket No. 31) ¶¶ 2, 11, 22, 33, 44, 53, 62, 73, 84, 95, 106, 117, 128, 139, 150 ("Compl."). JVC licenses the Patents both through individual licenses and through the DVD6C and One–Blue patent pools. The DVD6C and One–Blue patent pools have each respectively "commissioned an independent analysis to determine which patents owned by the consortium members," including JVC, "include claims" that are necessarily infringed, or for which there is no realistic or reasonable alternative for infringing, when implementing DVD or Blu-ray industry standards. JVC's Opposition to Nero's Motion to Strike JVC's Infringement Contention (Docket No. 56) at 4–5. Each of the Patents has been deemed essential to make or use products complying with the DVD or Blu-ray specification standards. JVC's Response to Nero's Statement of Uncontroverted Facts (Docket No. 101) ¶¶ 15, 17, 23, 28, 32, 36, 39–40, 45, 48, 50–51 ("UF"). JVC states that its "right to relief is asserted, in part on ... compliance with industry standard specifications" for DVD and Blu-ray. Compl. ¶ 9.

Although each of the Patents has been deemed essential to the DVD6C and One–Blue licensing pools, some of the Patents are essential to one pool but not another. JVC's Brief in Opposition to Nero's Motion for Partial Summary Judgment (Docket No. 93) at 5 ("JVC Resp. Brief"). In

addition, licensees authorized to produce a specific product by the licensing pool may not be licensed under a Patent that is not deemed essential to that specific product. *Id.* at 5–6. For example, a manufacturer licensed to produce a playable pre-recorded DVD disc would not have a license to the '711 Patent since the claims of the '711 Patent are directed to a rewritable optical disc and an apparatus for recording to an optical disc. *Id.* The DVD and One–Blue licensing pools also offer regional licenses, which grant licenses to patent rights corresponding to a specific country or geographical region. *Id.*

Defendant Nero, a Delaware corporation, sells software applications designed to allow end users to play, copy, and record data on DVD and Blu-ray optical discs. Compl. ¶ 7. JVC's infringement allegations against Nero are based upon Nero's "compliance with [the] industry standard." Compl. ¶ 9. JVC alleges that Nero has infringed twenty-six claims of the Patents. Each of the asserted claims are one of three types: (1) a claim directed to an optical disc or recording medium; (2) a claim directed to an apparatus for recording to or reproducing data on an optical disc or recording medium; or (3) a claim directed to a method for recording, reproducing, protecting, or decoding an optical disc or recording medium. The '970 Patent, for example, provides a representative claim of each of the three types. Claim 1 of the '970 Patent claims an optical disc, claim 3 claims an apparatus for recording and reproducing on a disc, and claim 4 claims a method of recording and reproducing on a disc.

JVC's theory of infringement of these claims is that when Nero software is used "to take a blank recordable disk or rewritable disk and write certain types of data to it," the user is "infringing a number of the patent claims." Transcript of Hearing on Nero's Motion for Partial Summary Judgment (Docket No. 127) at 4:17–22 ("Hearing"). Likewise, when Nero software is used to "read back that information" or "edit audio data or video data," the user is again infringing "a number" of the patent claims. *Id.* at 4:23–5:2. To summarize, when a user burns or plays back a DVD or Blu-ray disc by "implement[ing] the Nero software," some claims of the Patents are necessarily directly infringed. *See* Transcript of Hearing on Claim Construction (Docket No. 74) at 5:3–6, 5:14–6:7.

### III. Legal Standard

#### A. Legal Standard for Summary Judgment

The Court shall grant summary judgment if: (1) the movant shows that there is no genuine dispute as to any material fact; and (2) the movant is entitled to judgment as a matter of law. FED.R.CIV.P. 56(c); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The Court must: (1) identify material facts by reference to the governing substantive law, *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505; (2) disregard irrelevant or unnecessary factual disputes, *id.;* and (3) view facts and draw reasonable inferences in favor of the nonmoving party, *Scott v. Harris,* 550 U.S. 372, 378, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007).

The Court cannot grant summary judgment if the dispute about a material fact is one as to which a reasonable jury could return a verdict for the nonmoving party. *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. Faced with a properly supported summary judgment motion, the nonmoving party may not rest upon mere allegations or denials of its pleading but must set forth specific facts showing a genuine issue for trial. *Id.* "Where the record taken as a

whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Unsupported assertions alone are not sufficient to create a genuine dispute about a material fact. *See Davis v. Brouse McDowell, L.P.A.,* 596 F.3d 1355, 1364 (Fed.Cir.2010); *Hansen v. United States,* 7 F.3d 137, 138 (9th Cir.1993) (per curiam) (acknowledging the well-settled principle that "[w]hen the non-moving party relies only on its own affidavits to oppose summary judgment, it cannot rely on conclusory allegations unsupported by factual data to create an issue of material fact").

## B. Legal Standard for the Affirmative Defense of Patent Exhaustion

■ Patent exhaustion is an affirmative defense to patent infringement. *Tessera, Inc. v. ITC,* 646 F.3d 1357, 1367, 1369 (Fed.Cir.2011). "The longstanding doctrine of patent exhaustion provides that the initial authorized sale of a patented item terminates all patent rights to that item." *Quanta Computer, Inc. v. LG Elecs., Inc.,* 553 U.S. 617, 625, 128 S.Ct. 2109, 170 L.Ed.2d 996 (2008). Patent exhaustion applies to method claims when the patented item substantially embodies the method. *Id.* at 633, 128 S.Ct. 2109. After an initial authorized sale of a patented item, the patent exhaustion doctrine operates as a bar to infringement claims against subsequent users because the "authorized sale ... places [the] product beyond the reach of the patent." *Intel Corp. v. ULSI System Technology, Inc.,* 995 F.2d 1566, 1568 (Fed.Cir.1993).

■ Nero argues that a different standard applies for a claim of indirect infringement, rather than direct infringement. According to Nero, when an authorized purchaser uses the patented item, no act of direct infringement occurs because patent exhaustion has placed that item beyond the reach of the patent. A claim of patent infringement requires a direct infringer, and JVC, as the plaintiff, has the burden of establishing an underlying act of direct infringement. *See, e.g., Akamai Techs., Inc. v. Limelight Networks, Inc.,* 692 F.3d 1301, 1308 (Fed.Cir.2012). Therefore, Nero argues that JVC has the burden of proof to show that an unlicensed direct infringer exists.

■ Nero's point is well-taken and consistent with the law of indirect infringement, which requires more than just the possibility of the existence of a direct infringer. *See Mirror Worlds, LLC v. Apple Inc.,* 692 F.3d 1351, 1361 (Fed.Cir.2012) (Evidence that a product *could* directly infringe a patent "alone is not sufficient to find inducement of infringement of a method patent. Evidence of *actual use* of each limitation is required.") (emphasis added). However, in suits alleging both direct and indirect infringement of the same patent, this view would lead to the anomalous result of requiring both the defendant to prove a defense and the plaintiff to overcome the defense regardless of whether it is proven. The Court therefore finds that the burden of proof for the affirmative defense of patent exhaustion lies with the party asserting the defense, regardless of whether the claim asserts direct or indirect infringement.

## IV. Discussion

### A. Patent Exhaustion

■ The patent exhaustion doctrine applies to a patented item when there has been a sale authorized by the patent holder. *Quanta,* 553 U.S. at 625, 128 S.Ct. 2109. The "only reasonable and intended

use" of the patented item must be "to practice the patent." *Id.* at 631, 128 S.Ct. 2109. The patented item, however, does not need to be a completed article, but may instead only "embod[y] essential features of [the] patented invention" as long as the incomplete article is "within the protection of [the] patent." *United States v. Univis Lens Co.,* 316 U.S. 241, 250–51, 62 S.Ct. 1088, 86 L.Ed. 1408 (1942). Here, JVC authorized sales of the licensed DVD and Blu-ray optical discs by manufacturers to end users through the DVD6C and One–Blue licensing pools and its individual licensing program. In addition, the licensed DVD and Blu-ray optical discs embody the essential features of the Patents and the only reasonable and intended use of the discs is to practice the Patents.

### 1. Authorized Sale Requirement

■ An authorized sale occurs when the patent holder sells or permits another to sell a patented item and the sale occurs in conformity with the conditions of the patent holder's permission. *See Quanta,* 553 U.S. at 636–37, 128 S.Ct. 2109; *TransCore, LP v. Elec. Transaction Consultants Corp.,* 563 F.3d 1271, 1276–77 (Fed.Cir. 2009) (holding that patent exhaustion applied to customers purchasing from a manufacturer with whom the patent holder had covenanted not to sue). Numerous licenses have been granted to manufacturers of DVD and Blu-ray optical discs under the DVD Patent License Agreement from the DVD6C licensing consortium and Registration Agreements for Blu-ray disc manufacturers. UF ¶¶ 89, 102, 115. In addition, JVC has granted individual licenses to the Patents to several companies, including LG, Pioneer, UmeDisc, Ritek, Time Warner, Mitsubishi Kagatu, Daewoo, Sharp, Thomson, Sanyo, Samsung, Matsushita/Panasonic, CMC, and Moser Baer. UF ¶¶ 141, 153, 161, 193, 219, 230, 243, 254, 319, 327, 357, 402, 415, 423, 445.

These patent pool licenses and individual licenses authorize manufacturers to make and sell discs that practice each of the Patents deemed essential to the DVD or Blu-ray optical disc product that the licensee manufactures.

Although JVC admits that numerous manufacturers are licensed to make certain DVD and Blu-ray optical disc products, JVC argues that patent exhaustion does not apply to the optical disc products. JVC presents several arguments, which fall into three categories, each relating to one of the following products: unlicensed optical discs, partially licensed optical discs, and fully licensed optical discs.

### a. Unlicensed Optical Discs

■ JVC argues that there are parties that are not licensed to manufacture DVD and Blu-ray standards-compliant optical discs. In order for an unlicensed manufacturer to be relevant to this suit against Nero, JVC must show that these parties produced unlicensed standards-compliant optical discs and made, imported, or sold those discs in the U.S. In addition, end users in the U.S. must have used the unlicensed optical discs with Nero software. JVC, however, has failed to present such evidence or even specifically allege these facts.

In support of its allegations, JVC states that other unnamed parties somewhere in the world do not have licenses to the Patents. These statements are unsupported, immaterial assertions that cannot create a genuine dispute of a material fact. JVC fails to show the several facts necessary to render its argument material to this suit. Obviously, the Court cannot merely infer that these parties in fact manufactured optical discs, that these optical discs infringe the Patents, that these optical discs are manufactured, imported, or sold in the U.S., and that these optical discs are then

used in the U.S. with Nero software without any showing that these facts exist. *See, e.g., United States ex rel. Cafasso v. Gen. Dynamics C4 Sys., Inc.,* 637 F.3d 1047, 1061 (9th Cir.2011) (finding the non-moving party's evidence insufficient where it "establishes only that [a] set of events could conceivably have occurred" but "does not give rise to a reasonable inference that it did in fact occur"). To find liability on this evidence would require undue speculation. *See id.* ("To survive summary judgment, a plaintiff must set forth non-speculative evidence of specific facts, not sweeping conclusory allegations.") Without these elements, JVC's assertions are immaterial and insufficient to show that any optical disc sale was unauthorized.

**b. Partially Licensed Manufacturers**

■ JVC argues that not all of the granted licenses extend to all of the Patents. The DVD and Blu-ray licensing pools allow manufacturers to select a license depending upon the type of product the party intends to manufacture. For example, if a manufacturer wishes to make and sell DVD video optical discs, the manufacturer would select the DVD–Video license by checking an appropriate box. JVC Resp. Brief at 4–7. The manufacturer would thereby license the patents selected as essential to making, selling, and using playable DVD video optical discs and would not license patent selected as essential to making, selling, and using rewritable DVD optical discs or Blu-ray optical discs. *Id.*

Again, JVC leaves it to the Court to infer how the existence of these partially licensed manufacturers is relevant to this suit. The Court therefore considers two possible theories regarding partially licensed manufacturers: First, a manufacturer that checks boxes to obtain a license for some, but not all, of the Patents would infringe an unlicensed Patent if the manufacturer subsequently sold an optical disc that, in contravention to his license, infringed one of the Patents not included in the partial license. Second, a consumer would infringe an unlicensed Patent if the consumer used optical disc products made in conformance with a partial license in a manner that infringes on the Patents not included in the license.

■ Under the first theory, under which licensed manufacturers sell optical discs that exceed the scope of the license, those manufacturers and consumers would not be protected by the patent exhaustion doctrine. When a license grant explicitly limits the scope of a license with certain conditions,[1] and the licensee intentionally

---

1. The authorized sale element of patent exhaustion requires that the sale be "unconditional." Supreme Court precedent, however, does not clearly delineate the difference between a conditional sale and an unconditional sale. Over a century ago, the Supreme Court permitted patent holders to avoid the patent exhaustion bar by placing conditions on the sale to the consumer. *See Henry v. A.B. Dick Co.,* 224 U.S. 1, 32 S.Ct. 364, 56 L.Ed. 645 (1912). This conditional sale doctrine, however, survived only five years before it was explicitly overturned. *See Motion Picture Patents Co. v. Universal Film Mfg. Co.,* 243 U.S. 502, 37 S.Ct. 416, 61 L.Ed. 871 (1917). Prior to *Quanta,* the Federal Circuit held that where conditions to an authorized sale do not violate antitrust and competition law, patent licenses, like a contract, may be conditioned, and the patent infringement defense is available if the condition is violated. *Mallinckrodt, Inc. v. Medipart, Inc.,* 976 F.2d 700, 705–10 (Fed.Cir.1992) ("Should the restriction [on the license] be found to be reasonably within the patent grant, i.e., that it relates to subject matter within the scope of the patent claims, that ends the inquiry [into whether or not the condition is per se invalid under a misuse or antitrust defense]."). After *Quanta,* however, it is unclear to what extent the *Mallinckrodt* decision applies. *See generally* Alfred C. Server and William J. Casey, *Contract–Based Post–Sale Restrictions on Patented Products*

sells the patented article to a user that plans to and does exceed the scope of the license, the patent infringement remedy is available. *Gen. Talking Pictures Corp. v. Western Elec. Co.*, 304 U.S. 175, 58 S.Ct. 849, 82 L.Ed. 1273 (1938), *reh'g* at 305 U.S. 124, 59 S.Ct. 116, 83 L.Ed. 81 (1938). JVC, however, does not allege that any licensee makes, imports, or sells an optical disc that exceeds the scope of its license. Without such an allegation, the partial licensing scheme is immaterial to the question of whether an unauthorized sale has occurred.

Under the second theory, under which consumers use partially licensed optical discs in a manner that exceeds the scope of the license, the sale of the partially licensed optical disc is an authorized sale that can trigger patent exhaustion. If the partially licensed manufacturers were "authorized to sell [their] products to [end users], the doctrine of patent exhaustion prevents [JVC] from asserting its patent rights with respect to the patents substantially embodied those products." *Quanta*, 553 U.S. at 637, 128 S.Ct. 2109. Indeed, in *Quanta*, the patent exhaustion doctrine barred an infringement claim against a subsequent purchaser because once the licensee had made and sold the patented article consistent with the license, all the patents embodied in the patented article were exhausted. *Id.* at 634–35, 128 S.Ct. 2109 ("But if the device practices patent A *while substantially embodying* patent B, its relationship to patent A does not prevent exhaustion of patent B.").

Here, the licensing pools and individual licenses offer grants to selected patents found by experts to be essential to making or using the optical disc product selected by the licensee. JVC relies on these standards to show infringement in both its complaint and its infringement conten-

tions. If the Patent is essential to the standards, as indicated by JVC's complaint and infringement contentions, then it is within the scope of the license.

JVC's argument is therefore inconsistent with its own prior statements to the Court. JVC has relied on the standards-essential nature of the Patents to show that Nero's software infringes the Patents, but then disclaims that reliance in making this argument. According to JVC, a licensee to the DVD6C patent pool manufactures a licensed DVD optical disc. When an end user uses Nero's software on that licensed disc according to the DVD6C standards specification, that end user necessarily directly infringes one or more Patents not included in the license. Yet if the end user were necessarily infringing, the Patent not included in the license would have been included in the license. JVC cannot have it both ways—either the Patent is essential and licensed or JVC cannot rely on the standards to show infringement as it has chosen to do. JVC's argument regarding partially licensed optical discs therefore does not raise a disputed issue of material fact.

### c. Fully Licensed Manufacturers

■ JVC further argues that patent exhaustion does not apply even to the fully licensed DVD and Blu-ray products because it did not intend to license its software patents and claims when it licensed the Patents to optical disc manufacturers. Patent exhaustion is justified in part by the economic theory that in completing an authorized sale, a patent holder "has received in the purchase price every benefit of that monopoly which the patent law secures to him" and downstream control "would extend" the patent monopoly "beyond the fair meaning of the patent statutes and the construction which has hither-

to been given to them." *Univis*, 316 U.S. at 251–52, 62 S.Ct. 1088. According to JVC, by finding that an authorized sale of an optical disc exhausts method patents for playing, copying, and recording data on an optical disc, the Court denies JVC the full power of its patent monopoly and deprives it of additional licensing income. JVC has licensed two software manufacturers, which shows its intent to license both its optical disc and software inventions separately. Hearing at 69:4–17.

■ However, the intent of the patent holder to license or not to license downstream use after an authorized sale is irrelevant to the patent exhaustion analysis. *Quanta*, 553 U.S. at 637, 128 S.Ct. 2109 ("[E]xhaustion turns only on ... [the] license to sell products practicing the [licensed] Patents."). JVC licensed the manufacturers of DVD and Blu-ray optical discs, and the relevant question is not whether it thereby *intended* to exhaust the Patents, but whether it thereby *did* exhaust the Patents.

In addition, the two software licensees that JVC brings to the Court's attention are not part of a patent pool licensing program, or even a general licensing program with JVC. The software licensees are litigants, one of whom was formerly before this Court in the same action, and both of whom settled by obtaining a license from JVC. If JVC wishes to argue that licenses to optical disc manufacturers alone cannot offer adequate compensation for its invention, it must provide more than unsupported contentions and two settlement agreements. As in *Univis*, this Court will presume that JVC obtained adequate compensation for all exhausted patents when it negotiated its own DVD and Blu-ray licensing agreements.

■ The finding that exhaustion has occurred, despite the intent of the patent holder, is consistent with the purpose of patent exhaustion. End users should not be faced with the possibility of patent infringement if they purchase and use an authorized product that embodies a patent and is intended for use only to practice the patent. *See, e.g., Tessera*, 646 F.3d at 1370 (Allowing unpaid royalties under a license to negate an authorized sale "would cast a cloud of uncertainty over every sale, and every product in the possession of a customer of the licensee, and would be wholly inconsistent with the fundamental purpose of patent exhaustion—to prohibit post-sale restrictions on the use of a patented article.").

Nero has therefore carried its burden to show that the manufacture and sale of the DVD and Blu-ray optical discs used with Nero software are authorized under at least one of the DVD6C, One–Blue, or individual licenses.

### 2. Only Reasonable and Intended Use Requirement

■ The authorized sale must be of a patented item "which is capable of use only in practicing the patent" in order for the patent exhaustion doctrine to apply. *Univis*, 316 U.S. at 249, 62 S.Ct. 1088. The only intended or reasonable use for a blank, recordable DVD or Blu-ray optical disc is to record data to it. UF ¶¶ 1–2. Similarly, the only reasonable or intended use for a content-bearing DVD or Blu-ray optical disc is to play or copy content from the disc. UF ¶¶ 3–4.

JVC argues, however, that each claim of each Patent must be addressed separately. If there is a reasonable or intended use for an optical disc that would not practice that particular claim, then practicing that claim must not be the only reasonable or intended use of the optical disc. On this assumption, JVC parses out each type of claim from each Patent. The '008 and the '491 Patents are directed to fast-forwarding

and fast-reversing; the '404 Patent is directed to data compression; the '881 Patent is directed to editing audio data; the '692 and '329 Patents are directed to reproduction and decoding protection; the '711 and '790 Patents are directed to multi-layer recording conditions; the '970 Patent is directed to recording strategy and laser power.

In practice, and in the case law, however, JVC's focus on the single claim as the only reasonable or intended use is misleading. JVC cannot avoid the fact that, taken together, each of these individual claims constitute parts of the overall acts of playing or recording to an optical disc. JVC's strategy of pursuing multiple claim types across multiple patents during prosecution does not affect the use and purpose of optical discs. As in *Quanta*, "here, [JVC] has suggested no reasonable use for the [licensed DVD and Blu-ray optical discs] other than ... practic[ing] the [JVC] *Patents*." 553 U.S. at 632, 128 S.Ct. 2109 (emphasis added).

In addition, the only reasonable and intended use of an optical disc licensed under standards-essential patents must be to practice those patents because there is no alternative use. *See, e.g., Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 314 (3d Cir.2007) ("A standard, by definition, eliminates alternative technologies. When a patented technology is incorporated in a standard, adoption of the standard eliminates alternatives to the patented technology."). In *Quanta*, the patent holder suggested that the downstream consumer "disable the[ ] patented features" to avoid infringement. 553 U.S. at 632 n. 6, 128 S.Ct. 2109. JVC asks end users to do the same by suggesting that end users may take advantage of the standards-essential DVD and Blu-ray features of which the licensed discs are capable only when using the licensed discs with another product of JVC's choice. This restriction is exactly the type of downstream control the patent exhaustion doctrine is designed to avoid. *Univis*, 316 U.S. at 251, 62 S.Ct. 1088 (The purpose of patent law is to reward an inventor by sale of the patented article and "once that purpose is realized the patent law affords no basis for restraining the use and enjoyment of the thing sold."). Therefore, the Court finds that the only reasonable and intended use of the licensed DVD and Blu-ray optical discs is to play, copy, and record data in conformance with the DVD and Blu-ray standards specifications.

### 3. Substantially Embodies Requirement

■■■■■ An article substantially embodies a patent when the "essential, or inventive, feature" of the patent is incorporated into the article. *Quanta*, 553 U.S. at 633, 128 S.Ct. 2109. Here, each asserted claim of the Patents relates to optical discs. Some claims are directed to optical discs, some claims are directed to apparatuses for playing, copying, and recording data on an optical disc, and some claims are directed to methods for playing, copying, and recording data on an optical disc. The relevant question is whether the optical discs themselves embody the claims, including not only the claims directed to the optical discs, but also the claims to the playback and recording apparatuses and the methods of playing and recording to an optical disc.

*Quanta* held that apparatuses may embody method patents. *Id.* at 628, 128 S.Ct. 2109. It is clear that an article need not literally physically embody each element of a claim in order to substantially embody the patent. Furthermore, "the exhaustion analysis is not altered by the fact that more than one patent is practiced by the same product. The relevant consideration is whether the [article] that **partially** practice[s] a patent—by, for example, embody-

ing its essential features—exhaust[s] that patent." *Id.* at 635, 128 S.Ct. 2109 (emphasis added).

JVC's theory of infringement rests on the compliance of Nero's software with the same DVD and Blu-ray standards deemed essential to the manufacture, sale, and use of the licensed DVD and Blu-ray optical discs. This theory states that each Patent is essential to playing, copying, and recording data on an optical disc compliant with the DVD or Blu-ray standard. The Nero software must practice the Patents because the Nero software is used in conjunction with standards-compliant DVD or Blu-ray optical discs. UF ¶¶ 5–7, 11 ("The activities are those undertaken when an end-user records a disc (DVD and/or BD), plays a disc (DVD and/or BD), or displays video data when, for example, the user plays a disc (DVD and/or BD).").

JVC, however, argues for a strictly literal interpretation of "substantial embodiment." According to JVC, a method of protecting a disc from reproduction or decoding, for example, is embodied by the software performing the method and not the disc storing the protection data. But *Quanta* disposed of this strict interpretation, and instead looked to whether the point of novelty of the invention is contained in the patented item. 553 U.S. at 633, 128 S.Ct. 2109 ("Everything inventive about each patent is embodied in the [p]roducts.").

Many of the Patents include claims to both an optical disc and a method of recording to the optical disc. The ′491, ′711, ′790, ′970, ′404, and ′881 Patents all include claims to an optical disc or recording medium, and JVC has asserted those claims in this suit. The novel elements of these claims overlap.

The aforementioned representative claims of the ′970 Patent, for example, include language describing the point of novelty in the asserted claims of each type, whether for an optical disc, a system of recording to the optical disc, or the method of recording to the optical disc. Claim 1, directed to an optical disc, describes an "information management area storing recording management information having portions corresponding to respective at least three different integer multiples of a normal velocity relating to scanning of the disc" where each portion contains a first piece "representative of a recording strategy being a time-domain recording laser waveform for recording of information on the information recording area" and a second piece "representative of a recording laser power for recording of information on the information recording area." Claim 3, directed to an apparatus for recording data to an optical disc, and claim 4, direct to a method of recording data to an optical disc, describe the same information management area with the same portions corresponding to "different integer multiples of a normal velocity relating to scanning of the disc" and the same first and second pieces with the same functions.

Each of the other Patents with disc claims have similar overlaps in language, and no method claim is directed to any novel or inventive aspect that is not also described in the corresponding claim to an optical disc. If these claims are essential to the licensed DVD and Blu-ray optical discs, then those discs must embody the elements described in those claims. Since the method claims add no new inventive aspect, this Court finds that the optical discs also embody the method claims of the ′491, ′711, ′790, ′970, ′404, and ′881 Patents.

Even where JVC has chosen only to assert method claims for a specific patent, the method claims detail aspects of the recording medium, such as data arrangement and storage, including management

information and disc layers. JVC has asserted only method claims from the '008, '329, and '692 Patents. The '329 and '692 Patents, however, include unasserted claims to a data medium that are claims directed to an optical disc. Whether or not JVC chooses to assert these claims does not affect the analysis of whether the licensed DVD and Blu-ray optical discs embody the unasserted claims as well as the asserted claims. Like the claims described above, the licensed optical discs that practice the standards-essential Patents also embody the asserted method claims that incorporate the same novel aspects of the invention.

The remaining '008 Patent includes asserted claims to a method for reproducing data as well as unasserted claims to a system for reproducing data. The '008 Patent specification makes clear that, regardless of whether the patentee claimed an optical disc, the novel aspects of the invention may be embodied in an optical disc. The abstract of the '008 Patent describes a "disk" that "stores data groups ... arranged over sectors" where each data is "indicative of a compression method" and the data group. Without the particular order and grouping of the data on the disc, "[i]t is impossible to obtain the access data for accessing pictures or sounds to be restored from only a specific sector. Reproduction order data is added [to] every compressed data in predetermined unit to continuously restore the data." The '008 Patent at 5:64–67. An optical disc that contains or is manufactured to be capable of containing data ordered, grouped, and accessed as described in the '008 Patent embodies the novel aspects of the method claims of the '008 Patent, which are directed to methods of ordering, grouping, and accessing data.

For the reasons stated above, this Court finds that the licensed DVD and Blu-ray

optical discs substantially embody the inventive aspects of each Patent that the DVD6C and One–Blue licensing consortiums have deemed standards-essential to the corresponding optical disc product.

**B. Express Release**

■■ A patent holder may expressly release its right to sue for infringement of a patent. *See TransCore,* 563 F.3d at 1276–77. JVC expressly released its right to sue its licensees under the Patents for acts of infringement prior to the license agreement if those acts would have been permitted under the license. The releases extend from 2006 through the effective date of the licenses. JVC released its claims against licensees under the DVD6C patent pool according to the following language:

> [JVC] hereby releases Licensee and its Affiliates and their customers from any and all claims of infringement of the DVD Patents arising from Licensee's or its Affiliates' manufacture, use, sale, or disposal by other means of DVD Products for the period prior to the Effective Date of this Agreement ...

UF ¶ 86. JVC released its claims against licensees under the One–Blue patent pool according to the following language:

> [JVC] hereby releases, to the extent of its right to do so, Registered Party and Registered Affiliates, their respective successors and assigns, as well as any end-users, distributors, dealers, suppliers, vendors and customers, under any patent infringement arising prior to the Effective Date of this Agreement ...

UF ¶ 111. Similar language appears in each of the individual licenses submitted to the Court. UF ¶¶ 141, 153, 161, 193, 219, 230, 243, 254, 319, 327, 357, 402, 415, 423, 445. JVC acknowledges that the express release protects end users with a complete defense, such as patent exhaustion, who may have infringed the Patents by using a

disc sold by a manufacturer before the manufacturer was licensed. JVC Resp. Brief at 24 ("[T]he express release issue reduces to whether Nero can prove its patent exhaustion affirmative defense.") The express releases bar JVC's claim for past damages on acts of infringement that are currently barred by patent exhaustion.

JVC has also expressly released its claims of past infringement against licensed manufacturers of DVD and Blu-ray optical discs. Due to this express release, JVC has no claim for past infringement where it does not have a claim for present infringement. Since this Court holds that JVC's claim for present infringement is barred under the doctrine of patent exhaustion, the doctrine of express release also bars JVC's claim for past infringement.

### V. Motions to Strike

In conjunction with its responsive brief opposing Nero's motion for partial summary judgment, JVC submitted three declarations. Nero moved to strike each of the three declarations as inadmissible. The Court **SUSTAINS** Nero's objections to the declarations of Tetsuro Fuse, Faramarz Azadegan, and James Chang. The Court **STRIKES** from the record the Declaration of Tetsuro Fuse, the Declaration of James Chang, and the Declaration of Faramarz Azadegan.

### A. The Declaration of Tetsuro Fuse

■ JVC submitted a declaration from JVC's Operating Officer, Tetsuro Fuse ("the Fuse declaration"). The Fuse declaration contains broad statements concerning the licensing status of the "worldwide market" for Blu-ray discs and the status of several "representative" companies that do not have licenses for the Patents. The Fuse declaration relies upon "records maintained by or otherwise made available to JVC" but provides no information relat-

ing to the maintenance of the records and does not provide the records as exhibits. Nero generally objected to the Fuse declaration as irrelevant and inadmissible hearsay.

The Fuse declaration is irrelevant under FED.R.EVID. 401 for at least two reasons. First, statistics relating to the licensing of the Patents to the "worldwide market" and not the U.S. market are not helpful. There is no need to license a U.S. patent in order to practice that patent outside the U.S. without infringing. *See, e.g., NTP, Inc. v. Research in Motion, Inc.,* 418 F.3d 1282, 1313 (Fed.Cir.2005) ("The territorial reach of [35 U.S.C. § ]271 is limited. Section 271(a) is only actionable against patent infringement that occurs within the United States."). Therefore, statistics concerning worldwide licensing of U.S. patents do not make it more or less likely that there are unlicensed products in the U.S. that infringe the Patents. Second, the Fuse declaration lists companies that do not have licenses to the Patents but does not assert that these companies practice the Patents or conduct any activity requiring a license to the Patents. Without more, the statements in the Fuse declaration do not meet the standard for relevance under FED.R.EVID. 401.

■ The Fuse declaration is also inadmissible hearsay. JVC claims that the words "maintained by" are sufficient to qualify the statements in the Fuse declaration as records made in the course of a regularly conducted activity of a business. *See* FED.R.EVID. 803(6)(B). The Fuse declaration does not, however, address whether the records maintained by JVC were, in fact, "kept in the course of a regularly conducted activity." *Id.* Furthermore, the Fuse declaration relies on records "otherwise made available to JVC," which does not indicate that the declarant was the custodian or a qualified witness to these

records, as required by FED.R.EVID. 803(6)(D). The statements in the Fuse declaration are hearsay and do not qualify as an exception to the hearsay rule.

### B. The Declaration of Faramarz Azadegan

██ JVC submitted a declaration from its technical expert Dr. Faramarz Azadegan ("the Azadegan declaration"). The Azadegan declaration discusses the essential features of the Patents, whether an optical disc embodies the essential features of the Patents, and the reasonable and intended uses of optical discs other than to practice the Patents. Nero generally objected to the Azadegan declaration as contradicted by JVC's prior representations in its pleadings and infringement contentions in this case.

The Azadegan declaration contradicts JVC's binding prior representations made in this case. Throughout this case, JVC has taken the position that Nero's software must necessarily infringe the Patents because the Patents are essential to the standard. JVC argued that it could "map the standard" onto Nero's software during the parties' 26(f) scheduling conference with the Court. Transcript of Scheduling Joint Rule 26(f) Conference and Application for Permanent Injunction (Docket No. 37) at 9:2–18. This Court relied on JVC's use of the industry standard in upholding the adequacy of JVC's infringement contentions. *See* Order Granting In Part and Denying In Part Nero's Motion to Strike JVC Kenwood Corporation's Infringement Contentions As Insufficient (Docket No. 57) at 16–19.

JVC does not dispute its prior statements. Instead, JVC argues that the Azadegan declaration is consistent with its prior position. According to JVC, the analysis of "essential features" is different for infringement and exhaustion because

the infringement analysis addresses whether the Patents are essential to the software while the exhaustion analysis addresses whether the Patents are essential to the hardware, specifically, the discs. This hardware/software distinction that JVC now offers is exactly the distinction that JVC has argued to overcome in applying its hardware claims to Nero's software product. Claim Construction Order (Docket No. 85) at 32 ("The Court accepts the general proposition that when faced with claims plainly directed to hardware, software manufacturer *could* face patent infringement liability under theories of induced, contributory, or direct infringement.") JVC cannot overcome the inconsistency of its arguments by presenting a theory that a hardware/software distinction exists for patent exhaustion but does not exist for patent infringement. This contention has no support in the case law.

JVC fails to reconcile its prior statements with the Azadegan declaration for a second reason as well. The Patents are part of the licensing pool because they are essential to making and *using* discs and disc burners. The licensing board may require manufacturers to take a specific type of license for a specific activity, but regardless of the licensing scheme, the disc manufacturers obtain licenses to the Patents because the Patents are essential to making and using the disc. JVC cannot rely on the determination of the licensing board to avoid motions to dismiss on the pleadings and to strike infringement contentions and disclaim the same reliance for summary judgment. The Azadegan declaration is therefore inconsistent with JVC's prior assertions in this case.

### C. The Declaration of James Chang

██ JVC submitted a declaration from James Chang, an associate attorney ("the Chang declaration"). The Chang declara-

tion contains printed lists from the One–Blue and DVD6C licensing groups' websites "purporting" to list information regarding the parties and terms of the patent pool licenses. Nero generally objected to the Chang declaration as irrelevant and inadmissible hearsay.

 The Chang declaration is inadmissible hearsay. JVC does not address the hearsay objection in its response. When printed webpages are offered as evidence to prove the truth of the statements made on the webpage, they are inadmissible hearsay. *See* FED.R.EVID. 801; *United States v. Jackson*, 208 F.3d 633, 637 (7th Cir.2000) ("The web postings were not statements made by declarants testifying at trial, and they were being offered to prove the truth of the matter asserted. That means they were hearsay."). The Chang declaration offers the printed webpages and the charts summarizing the printed webpages to show the parties and the terms of the licenses as stated in the printed webpages.

The Chang declaration is also irrelevant for the same reasons as the Fuse declaration. Statistics relating to worldwide licensees and their regional licenses are not useful without corresponding information regarding importation of the licensees' products into the U.S. in a manner that infringes the Patents. The statements in the Chang declaration do not meet the standard for relevance under FED.R.EVID. 401.

## VI. Conclusion

End users' use of Nero software with DVD and Blu-ray optical discs licensed under the Patents is subject to the complete affirmative defense of patent exhaustion with regard to infringement of the Patents. JVC is further barred from asserting claims of direct infringement against end users for use of Nero software with DVD and Blu-ray optical discs made or sold by a party whose products have been expressly released from claims of infringement by JVC with regard to the Patents. JVC has only generally alleged acts of infringement by end users. Nero has shown an extensive licensing program, both as part of the DVD6C and One–Blue patent pools as well as through JVC's individual licensing program. Therefore, without specific allegations and evidence showing use of unlicensed optical discs, Nero has established a complete defense to all of JVC's allegations of infringement under the Patents.

IT IS SO ORDERED.